## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DONNA K. SALAZAR,**
*Individually and as Administrator of the*
*Estate of Mark E. Salazar, Deceased,*

      **Plaintiff,**

      **v.**                          **Civil Action No.  02-0558 (JDB)**

**ISLAMIC REPUBLIC OF IRAN, et al.,**

      **Defendants.**

## FINDINGS AND CONCLUSIONS

Plaintiff Donna K. Salazar ("plaintiff") is the widow of Mark E. Salazar, a decorated Army Staff Sergeant who was fatally injured in the bombing of the U.S. Embassy in Lebanon on April 18, 1983.  She brought this action against the Islamic Republic of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS"), the Iranian Islamic Revolutionary Guard Corps ("IRGC"), Hizbollah, and several former Iranian functionaries[1] (collectively, "defendants"), seeking compensatory damages for wrongful death, solatium, and intentional infliction of emotional distress, as well as punitive damages.  Without identifying a specific source of state or federal law for the causes of action articulated in the complaint, plaintiff argued that defendants

---

[1]  In addition to ninety-nine "John Does," the Complaint names as defendants Muhsin Fafiq-Dust, former Commander-in-Chief of the IRGC, Ali Akbar Hashemi Fafsanjani, former Speaker of the Majlis of Iran, Ali Akbar Mohtashemi, former Iranian Interior Minister, and Mohammad Rayshari, former Minister of the MOIS.  On June 10, 2003, because plaintiff was unable to serve Hizbollah or these individual defendants within 120 days of filing her Complaint, the case as to them was dismissed without prejudice.  See Fed. R. Civ. P. 4(m).

were subject to suit pursuant to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §

1605(a)(7),[2] and the so-called Flatow Amendment, 28 U.S.C. § 1605 note.[3]  Through diplomatic

_____

[2]  This "terrorism exception" to the FSIA, added by the Antiterrorism and Effective Death
Penalty Act of 1996 ("AEDPA"), provides that

> [a] foreign state shall not be immune from the jurisdiction of courts of the United
> States or of the States in any case – . . . in which money damages are sought against
> a foreign state for personal injury or death that was caused by an act of torture,
> extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material
> support or resources (as defined in section 2339A of title 18) for such an act if such
> act or provision of material support is engaged in by an official, employee, or agent
> of such foreign state while acting within the scope of his or her office, employment,
> or agency.

28 U.S.C. § 1605(a)(7).  The provision only waives the immunity of a foreign state defendant that
has been specifically designated by the State Department as a "state sponsor of terrorism," id. §
1605(a)(7)(A), and does not apply if

> (i) the act occurred in the foreign state against which the claim has been brought
> and the claimant has not afforded the foreign state a reasonable opportunity to
> arbitrate the claim in accordance with accepted international rules of arbitration; or
> (ii) neither the claimant nor the victim was a national of the United States (as that
> term is defined in section 101(a)(22) of the Immigration and Nationality Act) when
> the act upon which the claim is based occurred.

18 U.S.C.§ 1605(a)(7)(B).

[3]  Enacted five months after the passage of the AEDPA, the provision supplies a private
right of action against agents of foreign states in their personal capacities for the conduct
described in section 1605(a)(7).  It states, in relevant part, that

> [a]n official, employee, or agent of a foreign state designated as a state sponsor of
> terrorism . . . shall be liable to a United States national or the national's legal
> representative for personal injury or death caused by acts of that official, employee,
> or agent for which the courts of the United States may maintain jurisdiction under
> [section 1605(a)(7)] for money damages which may include economic damages,
> solatium, pain, and suffering, and punitive damages if the acts were among those
> described in section 1605(a)(7).

28 U.S.C. § 1605 note.

channels, plaintiff effectuated service on Iran, the MOIS, and the IRGC.  Those defendants failed

to appear, and the Clerk entered default against them.  The Court held a bench trial on September

26, 2003, and received plaintiff's proposed findings of fact on January 7, 2004.

Subsequently, the Court of Appeals issued two decisions that, taken together, called into

question the viability of plaintiff's claims, because their Complaint did not allege a viable cause of

action against Iran, the MOIS, and the IRGC independent of the FSIA and the Flatow

Amendment.  See Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024, 1033 (D.C. Cir.

2004) ("[N]either 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in

tandem, creates a private right of action against a foreign government.  Section 1605(a)(7) merely

waives the immunity of a foreign state without creating a cause of action against it, and the Flatow

Amendment only provides a private right of action against officials, employees, and agents of a

foreign state, not against the foreign state itself."); Acree v. Republic of Iraq, 370 F.3d 41, 59-60

(D.C. Cir. 2004) (Cicippio-Puleo's holding applies also to suits against agencies or

instrumentalities of a foreign state, and "generic common law" unmoored to any specific source of

law cannot supply a federal cause of action for a plaintiff proceeding under the FSIA).[4]  Pursuant

to an Order of this Court, plaintiff then filed an Amended Complaint specifying causes of action

under the laws of Utah, Illinois, and the District of Columbia.  Plaintiff unsuccessfully attempted

to serve the Amended Complaint on defendants by courier, and have since sent a copy of the

---

[4]  In a third case, Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1126-36 (D.C. Cir. 2004), the Court of Appeals elaborated on Cicippio-Puleo's jurisdictional analysis and concluded that Libya had been stripped of sovereign immunity for its alleged participation in the kidnaping and murder of a United States citizen, but declined to exercise pendent appellate jurisdiction over the question whether plaintiff in that case had identified a viable cause of action in state, federal, foreign, or international law.

Amended Complaint to defendants by airmail service delivery through the U.S. Postal Service.[5]

The Court finds that plaintiff's submissions and the trial record amply support the allegations of her Amended Complaint. Iran, the MOIS, and the IRGC directly and proximately caused the death of Mr. Salazar and have visited upon plaintiff immense personal and pecuniary loss. Accordingly, the Court concludes that once any remaining issues regarding the service of the amended complaint are resolved, judgment should be entered in favor of plaintiff on the wrongful death and intentional infliction of emotional distress counts in the Amended Complaint.

## BACKGROUND

### I.    The Embassy Bombing[6]

_____

[5] Plaintiff indicates she contacted the U.S. Department of State to inquire about serving the Amended Complaint through diplomatic means pursuant to 28 U.S.C. § 1608(a)(4) -- the method through which plaintiff served the initial Complaint on defendants -- but were told that service under section 1608(a)(4) is available only for an initial complaint and summons, and not for any subsequent pleadings. See Pls.' Rep. on Return of Serv. at 1.

[6] In a related case, this Court made extensive factual findings regarding the involvement of Iran, the MOIS, and Hizbollah in the embassy bombing that killed Sgt. Salazar. See Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 108-113 (D.D.C. 2003). Unlike the Dammarell plaintiffs, plaintiff here has also named the IRGC as a defendant. Plaintiff proposes that the Court take judicial notice of Dammarell's findings of fact with regard to Iran, the MOIS, and Hizbollah, and supplies expert testimony primarily with regard to her damages and the involvement of the IRGC in the bombing. "A court may take judicial notice of related proceedings and records in cases before the same court." MacMillan Bloedel Ltd. v. Flintkote Co., 760 F.2d 580, 587 (5th Cir. 1985); see also, e.g., Thurman v. Robinson, 51 F.3d 268, 1995 WL 133350, at *1 (4th Cir. Mar. 28, 1995) (explaining that a court will take judicial notice of its own records in another case "where the two cases represent related litigation"). Of course, a party opposing judicial notice of a given fact must be afforded an opportunity to be heard, FED. R. EVID. 201(e), and may certainly make recognized objections to the admissibility of such judicially noticed facts as evidence in the case, In re James, 300 B.R. 890, 896 (W.D. Tex. 2003). Defendants here, however, have failed to make any such objections. Indeed, they have failed to respond at all to process validly served upon them by diplomatic means. Accordingly, the Court's discussion of the factual background of this case summarizes and relies upon Dammarell's findings, but also rests upon the unopposed trial submissions of plaintiff in this case as to the IRGC and plaintiff's individualized damages.

Several developments of the early 1980s contributed to the radicalization of certain Islamic fundamentalist elements in Lebanon's Shi'a Muslim community.  First, in 1979, the Shah of Iran, an ally of the United States, was overthrown by the Ayatollah Ruhollah Khomeini and his followers, who set up a fundamentalist Islamic regime in Iran.  One of the revolutionaries' objectives was to establish Iran as the preeminent power in the Middle East by, among other things, forcing the United States and other Western nations out of the region.  Second, in the summer of 1982, Israel invaded southern Lebanon, putatively in order to prevent the Palestinian Liberation Organization from conducting terrorist activities across Lebanon's border with Israel. In the wake of these events, the nascent revolutionary government of Iran sought to export its anti-Western agenda by cultivating a Lebanese Shi'a terrorist group known variously as Hizbollah,[7] Islamic Jihad, Right Against Wrong, and the Revolutionary Justice Organization.  See Dammarell v. Islamic Republic of Iran, 281 F. Supp. 2d 105, 110 (D.D.C. 2003).  Iran provided Hizbollah with military arms, training, and other supplies, and issued propaganda to encourage Lebanese Shi'a Muslims to join the organization.  Id.

Plaintiff put on expert witness testimony to show that Iran trained, outfitted, and financed Hizbollah under the auspices of the IRGC, a uniformed military and terrorist operations force that answered to the Ayatollah, the "supreme leader" of Iran's theocracy.  Transcript of Bench Trial held Sept. 26, 2003 ("Tr.") at 34-36.  While the IRGC operated with the diplomatic and material support of the Iranian state, it maintained some degree of formal independence from the

---

[7] The name of this organization has been spelled in a variety of ways including "Hizbollah," "Hizballah," and "Hezbollah."  For ease of reference, the first spelling is used herein, except where an alternative spelling is reflected in exhibits or the official transcript of the evidentiary proceedings.

government.  Plaintiff's expert testified that the IRGC and the MOIS, the Iranian government's

official state security apparatus,

> liaise with each other.  They work with each other.  Each of them have certain
> capabilities.  The [MOIS] would be providing the [IRGC] with foreign currency,
> with diplomatic passports, with papers, with authority, for example, from Syria,
> who controlled the Bekaa Valley in Lebanon at the time and still does, for landing
> rights if the [IRGC] wanted to land supplies at Damascus or Beirut Airport.  The
> [MOIS] would work through the embassy to obtain th[is] type of thing[].

Id. at 37-38.  Likening the IRGC to Adolf Hitler's *Sturm Abteilung* (storm troopers) of the 1920s

and 30s, plaintiff's expert characterized the IRGC as a "party militia" and "pretty autonomous on

its own."  Id. at 39-40.

On April 18, 1983, an unidentified driver crashed a vehicle laden with explosives into the

With the support of the MOIS and the IRGC, Hizbollah undertook a series of terrorist acts

directed at Westerners in the early 1980s.  Dammarell, 281 F. Supp. 2d at 110.  These included the

kidnaping of David Dodge, then the Acting President of the American University of Beirut, the

bombings of a United States Marine Corps barracks and French paratrooper base in October 1983,

see Peterson v. Islamic Republic of Iran, 264 F. Supp. 2d 46 (D.D.C. 2003), and various other

high-profile hostage-taking operations.  See Dammarell, 281 F. Supp. 2d at 110.

On April 18, 1983, an unidentified driver crashed a vehicle laden with explosives into the

main entrance of the United States Embassy in Beirut.  Upon crashing into the Embassy, the

vehicle exploded with a force so powerful that seven floors in the center section of the crescent-

shaped building collapsed.  Id. at 111.  As a result of the blast and the resulting destruction of

portions of the Embassy, sixty-three people, including seventeen United States citizens, were

killed.  Over one hundred others were injured.  Id.  The bombing was the first large-scale attack

against a United States Embassy anywhere in the world.

At the time, it was not immediately clear who was responsible for the bombing.  But by

1984, the State Department had concluded that "radical Lebanese Shi'a using the nom-de-guerre

Islamic Jihad" and "operat[ing] with Iranian support and encouragement" were "responsible for

the suicide attack against the U.S. Embassy."  U.S. DEP'T OF STATE, 1993 PATTERNS OF GLOBAL

TERRORISM at 11.  Expert testimony received in the <u>Dammarell</u> case and now supplemented here

confirmed the consensus of the United States intelligence community that Hizbollah had

orchestrated and conducted the attack with the cooperation and support of Iran, the MOIS, and the

IRGC.  <u>See</u> 281 F. Supp. 2d at 112.  The complexity of the attack, the materiel employed,

contemporaneous Iranian directives identifying the Embassy as a valuable target, and the fact that

Lebanese Shi'a radicals lacked the sophistication and resources to execute the attack without the

help of Iran, all led to the conclusion that Iranian operatives had played a significant role in the

operation.  <u>Id.</u>

**II.      Plaintiff's Damages**

Sgt. Salazar was among those who sustained fatal injuries in the Embassy bombing.  At

the time, he was serving a ninety-day assignment to the Embassy as a specialist in power

generation equipment.  He was twenty-nine years old, married to plaintiff, and the father of one

daughter.

Plaintiff first learned of the Embassy bombing from a television report.  Tr. at 49.  Several

hours later, military personnel informed her that her husband was missing and presumed dead.

For approximately one week, plaintiff harbored hopes that her husband would be found alive.  Her

hopes were dashed when, on or about April 22, 1983, plaintiff was informed that his body had

been recovered.

After Sgt. Salazar was interred in his home state of Illinois, plaintiff took to visiting his

grave daily for several hours at a time.  Id. at 57-58.  She was unemployed and her daughter was only thirteen months old.  She moved in with her parents, returned to school, and ultimately found work.  Id. at 59-60.  Plaintiff began to drink more heavily and eventually required rehabilitation to deal with her alcohol abuse.  Id. at 60-61.  She has never remarried.

Plaintiff's daughter Jennifer,[8] presently a part-time student and bartender, has no memories of her father.  Id. at 65.  She testified that she had behavioral problems throughout her school years, which she attributes in part both to the absence of her father and her mother's troubles with alcohol.  Id. at 66-67.  She complains of difficulties in her relationships with men and traces such difficulties to "not seeing how a happy marriage is supposed to work or how [a] man is supposed to treat a woman."  Id. at 67.

Sgt. Salazar left no will.  Id.  Plaintiff put on expert testimony regarding the economic loss to his family caused by his death.  After analyzing his life expectancy, career prospects, prevailing interest and discount rates, and fringe benefits, plaintiff's expert calculated a total economic loss of approximately $3,297,000.  See Tr. Ex. 2.  Plaintiff seeks an additional $10 million in

---

[8]  While Jennifer Salazar is not named as a plaintiff in this action, plaintiff's submission of evidence as to her damages suggests an intent to add her as a plaintiff in this case.  "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.  Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues."  FED. R. CIV. P. 15(b).  The Court concludes in its discretion that the evidence presented at trial contemplates the addition of Jennifer Salazar as a plaintiff in this case.  See New York State Elec. & Gas Corp. v. Secretary of Labor, 88 F.3d 98, 103 (2d Cir. 1996) ("Rule 15(b) requires no motion or formal amendment of pleadings); Kirkland v. Dist. of Columbia, 70 F.3d 629, 632 (D.C. Cir. 1996) ("Trial of the issue without objection normally is enough to satisfy the Rule 15(b) requirement."); see also FED. R. CIV. P. 15(b) ("Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just.").

compensatory damages for herself and $5 million for her daughter, and punitive damages against the IRGC of $300 million.

## ANALYSIS

### I.     Jurisdiction

"Under the FSIA, a foreign state is immune from the jurisdiction of American courts unless the case falls within one of a list of statutory exceptions (or as provided by international agreements)." Kilburn, 376 F.3d at 1126.  The Court has subject matter jurisdiction only if one of the exceptions applies.  Section 1605(a)(7) of the FSIA eliminates sovereign immunity for a claim against a foreign state for personal injury "caused by an act of torture, *extrajudicial killing*, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."  28 U.S.C. § 1605(a)(7) (emphasis supplied).  Section 1605(a)(7) applies only where the foreign state was designated a state sponsor of terrorism at the time of the act or as a result of the act, the foreign state has been given a reasonable opportunity to arbitrate the claim if the act at issue occurred within the foreign state's territory, and either the claimant or the victim was a national of the United States at the time of the alleged act.  Id. § 1605(a)(7)(A), (B)(i)-(ii).[9]

---

[9]   Although Section 1605(a)(7) was enacted in 1996, as part of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 1605(a)(7), the Section applies retroactively, and thus covers the events at issue from 1983.  See Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 13 (D.D.C. 1998) ("'The amendments made by this subtitle shall apply to any cause of action arising before, on or after the date of the enactment of this Act [April 24, 1996].'" (quoting section 221(c) of Public Law 104-32)).  It bears noting as well that the Court has both subject matter jurisdiction over this case under 28 U.S.C. § 1330(a) (Actions Against Foreign States) and personal jurisdiction over defendants under 28 U.S.C. § 1330(b).  See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 89 (D.C. Cir. 2002).

Should an exception to the FSIA apply and a foreign state have no sovereign immunity as to a given claim, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state *except for an agency or instrumentality thereof* shall not be liable for punitive damages." Id. § 1606 (emphasis supplied). The FSIA defines "agency or instrumentality" of a foreign state as any entity

> (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

Id. § 1603(b). Additionally, if "in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought." Id. § 1606.

The requirements for applying section 1605(a)(7) and eliminating the sovereign immunity of Iran and MOIS -- as well as any sovereign immunity the IRGC might arguably possess -- are certainly satisfied here. As an initial matter, the more technical requirements of the section are satisfied: Iran was designated a state sponsor of terrorism as a result of the April 18, 2003, Embassy bombing; the bombing did not occur within Iran's territory; and the plaintiff and Sgt. Salazar both fulfill the citizenship requirement. Turning to the sufficiency of the acts alleged, the FSIA adopts the definition of "extrajudicial killing" in the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). See 28 U.S.C. § 1605(e). That Act defines an "extrajudicial killing" as:

-10-

> [A] deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note.

With respect to Sgt. Salazar, the evidence is conclusive that he and the other victims of the Embassy bombing were deliberately targeted for death and injury without authorization by a previous court judgment.  The attack was "'clearly contrary to the precepts of humanity as recognized in both national and international law,'" Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 107 (D.D.C. 2000) (quoting De Letelier v. Republic of Chile, 488 F. Supp. 665, 673 (D.D.C. 1980)), and constitutes an act of "extrajudicial killing" within the meaning of 28 U.S.C. §§ 1605(a)(7) and 1605(e)(1) and the Torture Victim Protection Act of 1991.  Just as clearly, defendants provided "material support" for this extrajudicial attack within the meaning of section 1605(a)(7).[10]  Accordingly, the Court concludes that it has subject matter jurisdiction in this case.

## II.    Causes of Action

In an opinion issued this day in Dammarell v. Islamic Republic of Iran, 01-2224 (JDB), a related action brought by more than eighty plaintiffs against Iran and the MOIS for their

---

[10]  See Cicippio v. Islamic Republic of Iran, 18 F. Supp. 2d 62, 67 (D.D.C. 1998) (holding that political hostages held by Hizballah could bring claim against Iran for its sponsorship of Hizballah because Iran "openly provided 'material support or resources' to Hizballah"); Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 33 & n.7 (D.D.C. 2001) (holding that the "Islamic Republic of Iran and the Iranian MOIS provided 'material support or resources' to Hizbollah within the meaning of 28 U.S.C. § 1605(a)(7), and citing other cases that have held the same); Kilburn, 376 F.3d at 1131 (holding that a foreign state need not directly support a specific terrorist act to lose immunity under section 1605(a)(7), so long as the terrorist acts are the reasonably foreseeable result of the foreign state's material support of an organization undertaking terrorist acts).

orchestration of the 1983 Beirut embassy bombing, this Court has detailed its conclusions of law on several issues relating to the liability of a foreign state or instrumentality in a section 1605(a)(7) case.  Among the Court's conclusions in that opinion are that plaintiffs may bring claims under state common and statutory law against a foreign state or instrumentality in such a case, Mem. Op. at 20-41; the District of Columbia provides the choice of law principles in such a case, Mem. Op. at 32-34; those choice of law principles will normally result in the state of the domicile of the plaintiff providing the rule of decision for issues of liability, at least in cases involving a terrorist attack on a United States embassy overseas, Mem. Op. at 34-41; and federal common law may not displace or complement state tort law in a section 1605(a)(7) case, Mem. Op. at 41-51.  Familiarity is assumed with the contemporaneous decision in Dammarell, and the Court will incorporate the principles of that decision in the similar action here.[11]

Plaintiff's Amended Complaint states causes of action for wrongful death, solatium, and intentional infliction of emotional distress under the laws of the District of Columbia, Utah, and Illinois.  Applying the reasoning of Dammarell, the Court concludes that plaintiff may proceed with her claims against Iran, the MOIS, and the IGRC under the law of the state of Illinois, her state of domicile at the time of the incident.  Mem. Op. at 40-41; Am. Compl. ¶ 5; see, e.g., Pescatore v. Pan American World Airways, Inc., 97 F.3d at 1, 5, 13-14 (2d Cir. 1996) (applying the substantive law of the domicile of the plaintiff in wrongful death action brought against airline for its negligence in permitting terrorist attack on airplane destroyed over Scotland).

A.     **Wrongful Death**

---

[11]   The principal differences between the two cases are that the causes of action differ somewhat, and that the instant action lists the IRGC as a defendant, while the complaint in Dammarell does not.

To recover on her claim for wrongful death under Illinois law, plaintiff must demonstrate that defendants owed a duty to Sgt. Salazar, that they breached that duty, and that the breach of the duty caused Sgt. Salazar's death. See Ill. St. Ch. 740 § 180/1; Leavitt v. Farwell Tower Ltd. Partnership, 625 N.E.2d 48, 51 (Ill. 1993). Sgt. Salazar's death was patently wrongful, and represented a breach of defendants' duty of care to Sgt. Salazar and others, as it was the result of a calculated attack intended to cause widespread death and injury. The evidence is also conclusive that defendants caused Sgt. Salazar's death by conducting or providing material support and resources for the bombing of the United States Embassy in Beirut. As this Court has concluded in Dammarell, Iran and the MOIS participated actively in the supply and motivation of the Hizbollah elements responsible for the attack. 281 F. Supp. 2d at 110. Plaintiff in this case has supplied convincing evidence that the IRGC, in its desire to stoke Islamist fervor in Lebanon, "set up training programs, provided equipment, supplies, taught [Lebanese terrorists] how to make bombs and explosives, helped them select targets, and directed them on operations." Tr. at 28. The attack on the Embassy would not have been possible but for these measures, which motivated and led proximately to the bombing. Thus, the Court concludes that defendants are liable to plaintiff for causing the wrongful death of her husband.

### B.      Intentional Infliction of Emotional Distress

Defendants are likewise liable to plaintiff for intentional infliction of emotional distress. To establish the tort of intentional infliction of emotional distress under Illinois law, a plaintiff must show that the defendants' conduct was extreme and outrageous; that defendants intended to inflict severe emotional distress or knew there was a high probability that the conduct would cause such distress; and that defendant's conduct did, in fact, cause emotional distress. Doe v. Calumet

City, 641 N.E.2d 498, 506 (Ill. 1994).  Plaintiff and her daughter, members of Sgt. Salazar's

immediate family, clearly may recover for the intentional, extreme and outrageous conduct of

defendants that caused them severe emotional distress.  The uncontroverted evidence at trial was

that Sgt. Salazar's killing resulted in severe emotional trauma to plaintiff and her daughter.

Defendants intentionally caused these injuries, in fact and proximately, by planning, supplying,

and supporting the Embassy bombing in which Sgt. Salazar was killed.  Thus, plaintiff may

recover against defendants for intentional infliction of emotional distress.[12]

### C.      Solatium

"A claim for solatium refers to the mental anguish, bereavement, and grief that those with a

close relationship to the decedent experience as a result of the decedent's death, as well as the

harm caused by the loss of decedent's society and comfort."  Dammarell, 281 F. Supp. 2d at 195.

Although the state of Illinois does not provide an independent cause of action for solatium, the

"pecuniary damages" recoverable under its wrongful death statute include damages for loss of

consortium.  See Holston v. Sisters of the Third Order of St. Francis, 618 N.E.2d 334, 347 (Ill.

---

[12]  As a general rule, to state a claim for intentional infliction of emotional distress, the outrageous and extreme conduct must be directed at the plaintiff, although there may also be a cause of action when the conduct causes severe emotional distress "'to a member of such person's immediate family who is present at the time.'"  See Green v. Chicago Tribune Co., 675 N.E.2d 249, 257-58 (Ill. 1st Dist. 1996) (quoting Restatement (Second) of Torts § 46(2)(a)).  Courts have uniformly held that a terrorist attack -- by its nature -- is directed not only at the victims but also at the victims' families.  See Burnett v. Al Baraka Inv. and Dev. Corp., 274 F. Supp. 2d 86, 107 (D.D.C. 2003) ("A terrorist attack on civilians is of course intended to cause emotional distress to the victims' families."); Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 35 (D.D.C. 2001) ("'If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability.'").  In this case, the evidence demonstrates that defendant's campaign of attacks against Westerners was intended not only to harm the victims, but to instill terror in their loved ones and others in the United States.  See Dammarell, 281 F. Supp. 2d at 109-113.

1993).  Moreover, "in an intentional homicide case such as a terrorist killing, solatium appears . . . to be indistinguishable from . . . intentional infliction of emotional distress."  Dammarell, 281 F. Supp. 2d at 195 n.19; Surette, 231 F. Supp. 2d at 269 n.8.  Accordingly, plaintiff cannot state a claim for solatium directly, but she may obtain the equivalent of solatium damages through her other causes of action.

**III.    Damages**

To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were "'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages."  Hill v. Republic of Iraq, 328 F.3d 680, 681 (D.C. Cir. 2003).  Here, it was reasonably certain that Sgt. Salazar's death and the attendant suffering of his family would occur given defendants' actions.  The evidence adduced at trial in this case and in Dammarell shows conclusively that defendants engaged in a deliberate campaign to destroy the Embassy by means of violent attack likely to result in the death of persons stationed there.  See Tr. 30-32; 281 F. Supp. 2d at 110-113.  Furthermore, plaintiff's expert generated a reasonable estimate of plaintiff's damages based on well-reasoned assessments of Sgt. Salazar's lost salary and earning potential.  See Tr. Ex. 2 (concluding that Sgt. Salazar's total economic loss, including lost wages and benefits, amounted to $3,297,000).  Plaintiff's additional compensatory damages of $10 million on her own behalf and $5 million on behalf of her daughter for intentional infliction of emotional distress and loss of consortium are consistent with damages awards made in similar FSIA cases.  See Stern v. Islamic Republic of Iran, 271 F. Supp. 2d 286, 300 (D.D.C. 2003); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1249 (S.D.

Fla. 1997).  The Court thus finds plaintiff's estimation of compensatory damages to be reasonable and appropriate.

However, the Court concludes that it cannot award punitive damages in this case.  As noted earlier, the Flatow Amendment permits punitive damages against "[a]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism," not against the foreign state itself.  28 U.S.C. § 1605 note.  The D.C. Circuit has ruled that Iran's Ministry of Foreign Affairs "must be treated as the state of Iran itself rather than as its agent."  Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003).  In reaching that conclusion, the court referred to Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994), in which it adopted a "categorical approach" to the question whether, under the FSIA's service-of-process provisions, an entity is a "foreign state or political subdivision" as opposed to an "agency or instrumentality."  Roeder, 333 F.3d at 234.  The court held that "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state."  Roeder, 333 F.3d at 234-35 (citing Transaero, 30 F.3d at 153).  In Transaero, the D.C. Circuit, applying this categorical test, had concluded that the Bolivian Air Force, and, indeed, "armed forces . . . in all cases," must "be considered as the 'foreign state' itself rather than a separate 'agency or instrumentality' of the state" under 28 U.S.C. § 1603.  30 F.3d at 153.  In Roeder, the court applied the categorical approach again -- this time under the Flatow Amendment -- in concluding that Iran's Ministry of Foreign Affairs must be considered as Iran itself and could not be considered an agent of Iran because the conduct of foreign affairs "is an important and 'indispensable' governmental function."  Roeder, 333 F.3d at 235 (citation omitted).

This Court has previously concluded for these reasons that punitive damages cannot be

recovered against Iran or MOIS.  See Dammarell, 281 F. Supp. 2d at 199-203.  Under that same

reasoning, punitive damages cannot be assessed against the IRGC either.  The IRGC, it is true,

does not fit as easily into Transaero's dichotomy of government entities with primarily

governmental or commercial functions.  Plaintiff contends that the autonomy of the IRGC from

the formal political controls of the Iranian government renders it a mere instrumentality of the

state.  Yet the Court is persuaded that, in its primarily military function and close association with

MOIS, the IRGC is more like an "armed force" under the ultimate command of the leadership of

the Iranian government (if not its political functionaries), than like a commercial agency or

instrumentality of the state.  The IRGC's mission is thus difficult to distinguish from that of the

MOIS:  both promulgated Islamist revolution in Lebanon on behalf of the revolutionary Iranian

government, and the two shared operational responsibilities in preparing for the Embassy bombing

and other terrorist activities.  In short, the Court can discern no meaningful distinction between the

two organs for purposes of the FSIA's punitive damages regime, and is therefore constrained to

decline plaintiff's prayer for punitive damages against IRGC as well as Iran and the MOIS.

## CONCLUSION

Because plaintiff has established considerable loss as a direct result of defendants' extreme

and outrageous conduct, and because the evidence in the record amply supports the allegations of

the Amended Complaint, judgment will be entered for plaintiff on her causes of action under

Illinois law and compensatory damages in the amount of $18,297,000 will be awarded, once the

Court determines that service of the Amended Complaint has been perfected upon defendants.

Plaintiff shall submit briefing on issues relating to the adequacy of service by not later than April

15, 2005.[13]  A status call will be held on April 19, 2005, at 9:15 a.m.  A separate order is issued on this date.


_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge


Dated:    March 29, 2005   

---

[13]  The FSIA outlines the procedures for effectuating service on a foreign state.  See 28 U.S.C. § 1608(a).  In this circuit, "strict adherence to the terms of 1608(a) is required."  Transaero, 30 F.3d at 154.  Although plaintiff reports that an official of the U.S. State Department told her that diplomatic service is unavailable for amended complaints under section 1608(a)(4), the Court notes that service of an amended complaint has been perfected through section 1608(a)(4) in the past, see Hill v. Republic of Iraq, 175 F. Supp. 2d 36, 38 (D.D.C. 2001); Letelier v. The Republic of Chile, 502 F. Supp. 259, 260 (D.D.C. 1980), and that at least one court has indicated that service of an amended complaint must comply with section 1608, see Bybee v. Oper Der Standt Bonn, 899 F. Supp. 1217, 1222 (S.D.N.Y. 1995).  On the other hand, the text of the statue suggests that it may apply only to initial service of a "summons and complaint," 28 U.S.C. § 1608(a), and some courts appear to have allowed informal service of an amended complaint following the entry of default, see Hill, 175 F. Supp. 2d at 38 n.2.  Plaintiff should address these and any other issues relating to the adequacy of service of the amended complaint in her brief to the Court.

Copy to:

John J. McDermott
HALL, ESTILL, HARDWICK, GABLE,
    GOLDEN & NELSON, P.C.
1120 20th Street, NW
Suite 700, North Building
Washington, DC 20036-3406
(202)973-2630
Fax : (202)973-1212
Email: jmcdermott@hallestill.com